HEIRS OF CAPAL *vs.* M'MILLAN, adm'r.

1. In adjusting the meaning of any of the provisions of a will, the testator's intention is allowed to exert a controlling influence—if that be clear, and not contrary to law, it must prevail, although in giving effect to it, some words should be rejected, or so restrained in their application, as to change their literal meaning.

2. Where the testator's intention would be advanced, courts have sometimes taken license not only to reject, but even to supply words.

3. If a *will* be ambiguous in any particular part, the whole *will* may be considered, for the purpose of ascertaining the testator's intent in that part.

4. As the property devised or bequeathed to infant devisees—legatees, most usually goes into the possession of their guardians, after the executor shall have collected the estate of the testator, and paid his debts; in order to allow it to remain with the executor, or to receive any other than its accustomed destination, the intention of the testator should appear from plain language, or clear implication.

5. In the construction of powers as well as wills, the intention of the parties, if compatible with law, governs the court.

6. In general, the intention is to be collected from the instrument creating the power; though a reference is sometimes allowable to the circumstances under which the power was given.

7. But where two intentions appear, a general and a particular one, such a construction shall be given to the power, that the general-intention shall take effect, even if the particular intent be defeated.

8. Where a studied regard to accuracy and precision of language in a *will*, is not discovered—the sense in which the testator employed terms, and the meaning he affixed to them, must be ascertained in determining his intention.

9. A mother has the second title to the guardianship by nature, which becomes paramount by the death of the father,—yet the guardian by nature is not entitled to possession of the child's estate.

10. The words of a testator are to be taken in their *ordinary* meaning, and not in their *technical* sense.

11. Where property is left by a testator to his minor children, to be given them when they respectively arrive at the age of twenty-one years, or marry, and to be managed by his widow during her widowhood—the control of the property by the widow ceases upon her marriage : and the right to the possesssion and control of the property, vests in the guardian of the minors.

Error to the Circuit court of Wilcox county, exercising chancery jurisdiction.

Tried before Judge *Crenshaw.*

The bill, in this case, stated that the father of complainants, before his death, (which took place in eighteen and thirty,) made his will—which contained the following clauses:

"Secondly.—I will and bequeath unto my son William, and my son-in-law, Young W. Grayson, the following negroes, to wit, a negro man named Allen, and his wife Aggey, and their three children, Cæsar, Altamore and Amey, with their future increase.

"Thirdly.—I will and bequeath unto my son-in-law, Young W. Grayson, one yellow horse, named Dungannon, and a good bed and furniture, as his full part and portion of my estate.

"Fourthly.—I will and bequeath unto my son, William M. Capel, a certain negro boy named Albert, to be considered as payment of what I am, or would be due to him, for property of his that came into my hands. I

Heirs of Capel *vs.* McMillan, adm'r.

also will and bequeath unto my son William Capel, one grey colt, a good bed and furniture, and my silver watch, —the watch to be given him when he arrives at twenty-one years of age—as his full part and portion of my estate.

"Fifthly.—I will and bequeath unto my beloved wife, Sally Capel, one negro man named Nelson, and his wife Esther and child Amelia, for and during her natural life, and at her death, the negroes so bequeathed, with their future increase, to be equally divided amongst my heirs, not already provided for. It is also my will, that my wife, Sally, shall have the use of the other negroes, during her widowhood, to wit, Amey, Sukey and London, and to be kept by her during the time aforesaid, for the purpose of assistance in supporting her and the children. I also will and bequeath unto my beloved wife, one bay mare, and one grey mare, and one Indian horse, during her widowhood, and at her marriage, to be divided amongst the rest of my heirs, not provided for.

"Sixthly.—It is my will and desire, that my negroes, not bequeathed, be hired out yearly, and my plantation rented by my executrix and executor, hereinafter appointed; and that my wife, Sally, should be entitled to receive out of the proceeds thereof, the sum of two hundred dollars, in each and every year, for the support and education of the children, during her widowhood, or until my son, Alexander, shall arrive at the age of twenty-one years.

"Seventhly.—It is my will and desire, that all my stock of cattle and hogs, should remain unsold, for the use, support and maintenance of my family. It is also my will, that

all my household and kitchen furniture, should remain unsold, for the use of my wife, Sally, and the children.

"Eighthly.—It is my will, that all my negro property, land, stock of every description, and all my estate, both real and personal, except that specially bequeathéd to my son-in-law, Young W. Grayson, and my son, William M. Capel, shall be divided among my younger children, (meaning the complainants,) equally, and that they shall be entitled to receive the same, when they arrive at the age of twenty-one years, or marry, except the property already bequeathed to my wife.

"Ninthly.—I appoint my wife, Sally, executrix, and Irwin R. Capel, executor, of this, my last will and testament."

That shortly after the death of the testator, the executor, Irwin R. Capel, also departed this life: and that Sally Capel, took upon herself the execution of the will, and in November, eighteen hundred and thirty-one, intermarried with John Nugent, the present guardian of complainants: That said Sally was thereupon displaced from the office of executrix, by the Orphan's court of Wilcox, and Alexander Gordon, appointed administrator, —who settled the estate, and resigned the administration.

David McMillan, the defendant, by virtue of his office of coroner of the county, was then appointed, administrator *de bonis non*, with the will annexed, who possessed himself of the estate : That complainants were the younger children, and that William M. Capel, Young W. Grayson, and Sally, have received their bequests as mentioned in the will, and that the residue of the estate is in the

Heirs of Capel *vs.* McMillan, adm'r.

hands of defendant, who had annually hired out the same, and that it had considerably increased.

Complainants, in eighteen hundred and thirty-four, removed to Mobile, where their father-in law, John Nugent, was appointed their guardian: That the negroes could be hired out in Mobile to better advantage than in Wilcox, and that it would be greatly to the injury of complainants, to permit defendant to manage the property, until they arrived at mature years, and that some competent person in Mobile ought to be appointed to manage the property. Complainants, from their youth, were unable to do any thing for their own support, and were maintained by their father-in-law, the amount allowed them by defendant being inadequate for their maintenance; and that their guardian had applied to the defendant for the property, and for a settlement, which had been refused. Complainants prayed for an account, and that the property might be transferred to their guardian.

The answer admitted the statement contained in the bill, and furnished an account and schedule of the estate in the hands of defendant—had no objection to surrendering the estate, which consisted of twenty negroes, sundry notes, lands, &c. if the court should so order—thought the negroes would be exposed to injury in health and morals, by removing them to Mobile, and doubted the competency of the guardian to manage the estate.

The chancellor was of opinion, that the will required that the estate should remain in the hands of the executors, until the children arrived at the age of twenty-one years, or married, and that the court had no right to remove an executor without cause: That a guardian is not

.8 P.                    26

entitled to the possession of the ward's property, unless the right of possession vests in the ward. The court thought the negroes would be liable to receive injury by a removal to Mobile, and would have been inclined to dismiss the bill, but for the suggestion, that the amount allowed the minors' by the administrator, was insufficient for their maintenance. It was therefore referred to the master, to ascertain what would be a reasonable allowance for the maintenance and education of the minors.

- The master, at a subsequent term, reported a definite sum, and his report was confirmed by the court.

Assignment—That the chancellor erred in decreeing that the property of the wards should be retained and held by the administrator, and in not decreeing the same, to be, by the said administrator, the defendant in error, surrendered to the plaintiffs.

*Porter*, for plaintiffs in error.
*J. B. Clarke*, contra.

COLLIER, C. J.—The only question arising in this case is, whether the defendant, as administrator *cum testamento annexo*, is entitled to the possession of the property devised and bequeathed by his testator to the plaintiffs, or does its possession and control properly belong to their guardian ? Assuming the defendant to stand in the attitude of an executor, the solution of this question will depend upon the exposition of the sixth and eighth clauses of the testator's *will;* which are as follow :

"Sixthly.—It is my will and desire, that my negroes

Heirs of Capel *vs*. McMillan, adm'r.

not bequeathed, be hired out yearly, and my plantation rented by my executrix and executor, hereinafter appointed; and that my wife, Sally, should be entitled to receive, out of the proceeds thereof, the sum of two hundred dollars, in each and every year, for the support and education of the children, during her widowhood, or until my son, Alexander, shall arrive at the age of twenty-one years.

"Eighthly.—It is my will, that all my negro property, negroes, land, stock of every description, and all my estate, both real and personal, except that specially bequeathed to my son-in-law, Young W. Grayson, and my son, William M. Capel, shall be divided among my younger children equally, and that they be entitled to receive the same, when they arrive at the age of twenty-one years, or marry, except the property already bequeathed to my wife."

It will be observed, that the will does not, in terms, prescribe any period during which the executrix and executor shall continue to hire out the negroes and rent the land. To be informed upon this point, then, we must look to the will itself, to ascertain the testator's intention, in thus diverting the property from the control of the guardian of the legatees, and vesting his legal representatives with the unusual authority, to retain its possession and management. As wills are often made *in extremis*, and drawn by persons unskilled in the law, without the aid of professional advice, great liberality is indulged in their interpretation. In adjusting the meaning of any of the provisions of a will, the testator's intention is allowed to exert a controlling influence;—if

that be clear, and not contrary to law, it must prevail, although, in giving effect to it, some words should be rejected, or so restrained in their application, as to change their literal meaning—(Finlay et al. vs. King's Lessee, 3 Pet. R. 377; Bell and wife vs. Hogan, 1 Stew. R. 536; Drury & Bennett vs. negro Grace, 2 Har. & J. R. 356; Smith vs. Bell, 6 Pet. R. 68.) And where the testator's intention would be advanced, courts have sometimes taken license not only to reject, but even to supply words. —(Doe vs. Roe, 1 Wend. Rep. 541; Jackson, *ex dem.* of Gatfield vs. Strang, 1 Hall's Rep. 1.) So, if a *will* be ambiguous in any particular part, the whole *will* may be considered, for the purpose of ascertaining the testator's intent in that part—(Jackson *ex dem.* Van Vechten vs. Sill, 11 Johns. R. 201; Dashiel et al. vs. Dashiel, 2 Har. & Gill's R. 127; Land et al. vs. Otley, 4 Rand. R. 213; Moore vs. Dudley and wife, 2 Stew. R. 170.)

As the property devised or bequeathed to infant devisees or legatees, most usually goes into the possession of their guardians, after the executor shall have collected the estate of the testator and paid his debts, in order to allow it to remain with the executor, or to receive any other than its accustomed destination, the intention of the testator should appear from plain language or clear implication—(Roosevelt vs. Fulton's heirs, 7 Cow. R. 71; Jackson *ex dem.* Bogert vs. Schauber, 7 Cow. R. 187.)

As the authority given to the executrix and executor, by the sixth clause of the will, is a power in nature of a trust, it may be well to lay down some rules, in regard to the interpretation of powers: In the construction of powers as well as wills, the intention of the parties,

Heirs of Capel *vs.* McMillan, adm'r.

if compatible with law, governs the court—(Pomery vs. Partington, 3 T. R. 665; Smith vs. Doe *ex dem.* Jersey, (Earl) 3 Bligh's R. 290; 7 Price's R. 281; 3 Moore's R. 339; 2 B. & B.'s R. 474; Tankerville vs. Coke, Mosely's R. 175, (a); Liefe vs. Saltingstone, 1 Mod. R. 189; Talbot vs. Tipper, Skinner's R. 427; Bristow vs. Ward, 2 Ves. jr. 547; Wilson vs. Troup, 2 Cow. R. 195; Jackson vs. Vreeder, 11 Johns. R. 169; Mitchell vs. Maupin, 3 Monroe's R. 185.) In general, the intention is to be collected from the instrument creating the power, though a reference is sometimes allowable to the circumstances under which the power was given—(Griffith vs. Hanson, 4 T. R. 748; Doe vs. Rendle 3 M. & S. R. 99.) But where two intentions appear, a general and a particular one, such a construction shall be given to the power, that the general intention shall take effect, even if the particular intent be defeated—(Robinson vs. Hardcassle, 2 T. R. 241; Jackson vs. Vreeder, 11 Johns. R. 169; Smith vs. Bell, 6 Peters' R. 68.)

Having stated these acknowledged rules, as guides for the judgment we are to pronounce, we proceed to consider the two clauses of the *will*, out of which this controversy has arisen. It will be premised, that the *will* does not discover any studied regard to accuracy and precision in the use of language; we must, therefore, in determining the testator's intent, endeavor to ascertain the sense in which he employed terms, and affix to them the same meaning.

That the mother has the second title to the guardianship by nature, which title becomes paramount upon the death of the father, is a clear principle; yet, the guardian

by nature is not entitled to the possession of the child's estate—(Miles vs. Boyden, 3 Pick. R. 213; 5 Porter's R. 392; Isaacs, by next friend, vs. Boyd et al.)

The testator manifests a confidence in the judgment and discretion of the wife, so long as she continues unmarried; and is desirous that during that period, she shall direct the education of their children; and to effect this object, and enable her to receive the means for that purpose, he directs that the negroes not previously bequeathed, shall be hired out, and his plantation rented by his executrix (wife) and executor, and his executrix to receive out of the proceeds thereof, two hundred dollars, at the end of every year.

The will does not leave it to be determined by construction, for what particular time this sum is to be received and appropriated by the executrix: its terms are explicit, and provides a limitation, viz. "during her (wife's) widowhood, or until my (testator) son, Alexander, shall arrive at the age of twenty-one years." The events which are to determine the right of the executrix to receive money for the support and education of the children, need not both happen;—they are expressed disjunctively, so that the one which shall first occur, puts an end to the right. The moving cause for the insertion of the power to hire out the negroes, and rent the plantation, was to enable the wife to receive a part of the proceeds arising from these sources, to defray the expences, consequent upon the support and education of the children, without executing a bond, as their guardian, or giving other security than that required for the faithful performance of her duties, as an executrix of the will.

Heirs of Capel *vs.* McMillan, adm'r.

The inducement which prompted the testator to confer this power, ceased to exist immediately upon the marriage of the executrix, for her widowhood no longer continuing, her right to receive the two hundred dollars was at an end.

This view derives aid from the fifth clause of the will. In the first part of this clause, the testator makes a provision for his wife for *her life*. In the latter part, he says: "It is also my will, that my wife, Sally, shall have the use of the other negroes during her widowhood, to wit, Amey, Sukey and London, and to be kept by her during the time aforesaid, for the purpose of assistance in supporting her and the children.

I also will and bequeath unto my beloved wife, one bay mare, and one grey mare, and one Indian horse, during her widowhood, and at her marriage, to be divided amongst the rest of my heirs, not provided for." The wife's right to the property bequeathed by this clause, did not continue beyond the period of her marriage: upon the happening of that event, the guardian of the heirs intended, became entitled to its *actual* possession. The children provided for by the sixth, are doubtless the heirs contemplated by the fifth clause, and it is difficult to conceive of a motive to a change of the possession of the property in the one case, which would not have influenced the testator in the other.

The testator certainly desired that the maintenance of his children should be transferred to some one else, as soon as his wife should again marry, or, at least, he did not wish the proceeds of their estate to be received and disbursed by her for that purpose, in the character of an

executrix.   He was willing to confide to her this impor-
tant duty, so long as she continued in a situation to exer-
cise her own judgment and discretion uncontrolled by a
husband, but as he could not anticipate who was to suc-
ceed him in her affections, he was unwilling that the
possession of the property, and the disposition of the
fund provided by the will, should be entrusted to his
wife, beyond the period of a second marriage.   And if
the wife made a prudent selection of a second husband,
neither the children or mother would be prejudiced by
thus interpreting the testator's intent, for the husband
would doubtless be appointed by the court, guardian of
the children under fourteen years, and if chosen by those
older, he would certainly be approved—but if the wife's
choice was unfortunate, it would not be desirable that
the guardianship should be committed to the husband.

Perhaps it may be said that it may have been the con-
fidence reposed in the executor named in the will, that
influenced the testator in framing, as he did, the sixth
clause.   The will no where discovers that such a consid-
eration prompted him.   A confidence in the wife, so long
as she continued sole, we think has been shewn to have
been the moving cause.   The executor was most proba-
bly named for the purpose of aiding the wife in the per-
formance of duties, which, to her, must have been oner-
ous, viz. to hire out the negroes, and rent the plantation.

Nor do we consider that there is any thing in the
eighth clause, repugnant to the view we have taken.   The
direction, there, that the *younger children* shall be enti-
tled to receive the property given them by the will, when
they arrive at the age of twenty-one years, or marry,

does not inhibit a guardian of the children from taking possession of it previously. The testator did not employ words in their technical sense, but in their ordinary acceptation, and so we must understand them—(Land et al. vs. Otley, 4 Rand. R. 213.) Now, though the possession of the guardian would, by construction of law, be the possession of the ward, yet, as the testator evidently intended an *actual* possession, with the right to control the property, (this being the popular meaning of the words employed,) in furtherance of his intention, he must be so understood. The words, " except the property already bequeathed to my wife," clearly relate to property bequeathed to the wife during her life, and which, after her death, is directed "to be equally divided amongst my (testator's) heirs, not already provided for," and does not embrace that given during widowhood, to aid the wife in the support and education of the children.

There is no conflict between the general and particular intent of the testator, in framing the sixth clause of his will. His intention was to provide for his children, not specially provided for, a patrimony, and also the means of support and education during their minority. The expenditures for the support and education of the children, were to be regulated by the wife during her widowhood: after her marriage she was not authorised to receive the proceeds of their estate, to defray the charges of their maintenance. This, we think, indicates the testator's intent to have been, that as the executrix was to receive a portion of the proceeds of the children's estate, in order to their support and education, the possession of the estate itself is vested in her and her co-execu-

tor, that she might perform this duty with the more ease and convenience to herself. Besides, the testator probably believed, that so long as he remained single, the interest of her children would be paramount to that of all other persons, and consequently, their estate would be most profitably managed by her, but as the interest of a husband might conflict, or his will would predominate, whenever she changed her situation, he intended the power given by the sixth clause to cease, and the property to go into the possession of such person or persons as might be regularly approved and appointed to the guardianship of the infant plaintiffs.

That the intent of the testator may be effectuated, the decree of the Circuit court is reversed, and the cause remanded. And it is further adjudged and decreed, that such proceedings be taken in the Circuit court, as may lead to a settlement of the administration accounts of the defendant, upon such principles as may be just and proper. It is further ordered and adjudged, that upon the execution of a bond or bonds by John Nugent, as guardian, &c. in a sufficient penalty, and with adequate security, before the judge of the County court of Mobile or Wilcox county; conditioned as the bonds of guardians are by law directed to be, *to be approved by the judge of the Circuit court of Wilcox*; that then the defendant be directed to pay over to the guardian all monies, and deliver to him all bonds, notes and slaves, and relinquish to him the possession of the lands belonging to the infant complainants, and the costs of this cause, are to be paid by the defendant, out of the estate of the testator in his hands unadministered.